**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **Deborah Shuster** | : | |
| 2285 Edmonton Road | : | |
| Columbus, Ohio 43229 | : | |
| | : | |
| Plaintiff, | : | Case No. 2:21-CV-468 |
| | : | |
| v. | : | Judge |
| | : | |
| **Solid Waste Authority of Central Ohio** | : | Magistrate Judge |
| 4239 London-Groveport Road | : | |
| Grove City, Ohio 43123 | : | |
| | : | |
| Defendant. | : | |

**COMPLAINT**
*(Jury Demand Endorsed Hereon)*

Plaintiff Deborah Shuster, by and through undersigned counsel, states the following as her Complaint for claims arising under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and Ohio's antidiscrimination laws, R.C. Chapter 4112, against Defendant Solid Waste Authority of Central Ohio ("Defendant"):

**JURISDICTION AND VENUE**

1.  This Court has subject matter jurisdiction over Counts I, III, IV, V, VI and VIII pursuant to 28 U.S.C. § 1331 because the claims are set forth pursuant to the laws of the United States of America.

2.  The Court has supplemental jurisdiction over Counts II, VII and IX Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, because the claims arise out of the same set of

1

operative facts that together form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. § 1391 as the events giving rise to the causes of action occurred in Franklin County, Ohio, within the Southern District of Ohio, Eastern Division.

## PARTIES

4. Plaintiff is a natural person residing in Franklin County, Ohio, living in the Southern District, Eastern Division. At all relevant times, Plaintiff was an employee of Defendant SWACO as that term is defined by the ADA, 42 U.S.C. § 12111(4), the FMLA, 29 U.S.C. § 2611(3), Title VII, 42 U.S.C. § 2000e(f), and Ohio's antidiscrimination law, R.C. 4112.01(A)(3). Plaintiff was an eligible employee as that term is defined by the FMLA, 29 U.S.C. § 2611(2), because she worked for Defendant SWACO for at least 12 months and worked at least 1,250 hours.

5. Defendant is a Solid Waste Management District organized under the laws of Ohio as a political subdivision of the State of Ohio and is governed by a nine-member Board of Trustees for the Franklin County Solid Waste Management District located primarily within Franklin County. Defendant operates a landfill that serves Franklin County, Ohio. The purpose of Defendant is to reduce the amount of waste that goes to the landfill through community programs, recycling partnerships and education. Defendant is an employer as that term is defined by the ADA 42 U.S.C. § 12111(5)(A), FMLA, 29 U.S.C. § 2611(4), Title VII, 42 U.S.C. § 2000e(b), and Ohio's antidiscrimination law, R.C. 4112.01(A)(2).

## FACTS COMMON TO ALL COUNTS

6.    Plaintiff is disabled as that term is defined by the ADA, 42 U.S.C. § 12102(1)(A), which substantially limits one or more major life activities. Plaintiff's disabilities substantially limit the following major life activities: concentration, motivation, sleep, ability to complete tasks, memory, and work. Further, Plaintiff is often unable to go to public places alone, to shower and care for herself or her home.

7.    Plaintiff has a serious health condition as that term is defined by the FMLA because she has serious medical conditions that involve continuing care by a health care provider pursuant to 29 U.S.C. § 2611(11)(B).

8.    Plaintiff's husband, James M. Shuster ("Mr. Shuster"), is disabled as that term is defined by the ADA, 42 U.S.C. § 12102(1)(A), (B), because he has a physical impairment that substantially limits one or more major life activities, including but not limited to the operation of a major bodily function of the bowel; and/or Mr. Shuster has a record of such an impairment; and/or Defendant regarded Mr. Shuster as having such an impairment. During Plaintiff's employment, Mr. Shuster experienced exacerbation of his disability that required Plaintiff's care and assistance with physician care, appointments, further medical testing, as well as at home care.

9.    Although Plaintiff cared for Mr. Shuster at home and assisted him with his medical care, she worked approximately 50 hours per week.

10.    Defendant repeatedly expressed dissatisfaction with Plaintiff's need for time off to care for the serious medical conditions and/or disabilities of Plaintiff and her husband.

11.    Plaintiff became the Human Resources ("HR") Manager of Defendant SWACO on February 6, 2017.

3

12. At the time of her hire, Defendant did not have a Director of Administration. Therefore, Ty Marsh, Executive Director of Defendant, was Plaintiff's direct supervisor from her start date on February 6, 2017 through November 27, 2017.

13. Beginning in May 2017, Plaintiff began seeking medical care every two weeks for treatment related to her serious medical conditions and/or disabilities.

14. As a result of the treatment by Defendant, Plaintiff was attending an Excel training class offsite on or about September 19, 2017 when she began to have chest pains. Plaintiff sought medical attention and was transferred by squad to Riverside Methodist Hospital, where she was admitted. It was determined that Plaintiff's symptoms were due to stress caused by her employment with Defendant and high blood pressure. Plaintiff was discharged the following day, on or about September 20, 2017.

15. Plaintiff saw her family physician on or about September 20, 2017, who excused Plaintiff from work through September 24, 2017.

16. Plaintiff returned to work without restrictions on or about September 25, 2017.

17. On or about September 26, 2017, Plaintiff had a one-on-one meeting with Mr. Marsh. In addition to discussing the projects that Plaintiff was working on, the two discussed the results of Mr. Shuster's recent doctor's appointments and that he would have to go through some further testing and see specialists. Mr. Marsh asked a lot of questions about Mr. Shuster's health.

18. On or about November 28, 2017, Defendant hired Jeff Wilkins as the Director of Administration and Plaintiff's direct supervisor.

19. On or about December 11, 2017, Mr. Wilkins informed Plaintiff that he would meet with Plaintiff for her one-on-ones instead of Mr. Marsh.

20.    Plaintiff received a positive performance review on or about December 13, 2017.

21.    During Plaintiff's one-on-one with Mr. Wilkins on or about April 2, 2018, she complained that he was preventing her from accomplishing tasks that he assigned and that the required spreadsheets were inconsistent and nonproductive.  Mr. Wilkins did not respond.

22.    Plaintiff met with Mr. Wilkins on or about April 25, 2018 regarding Plaintiff's goals. Mr. Wilkins wanted to make sure Plaintiff's goals fit in with the 2018 department priorities and explain how they link to other departments and the 2018 Strategic Goals. Plaintiff again complained that the changing goals and initiatives in addition to remedying years of mistakes in payroll prior to Plaintiff's employment were exacerbating her serious medical conditions and/or disabilities.

23.    Mr. Wilkins indicated the goals would not be held against anyone that year. Mr. Wilkins stated that Mr. Marsh only wanted management to practice goal setting and do the best they could. If goals were not accomplished, then just give a reason why.

24.    During May of 2018, Plaintiff's serious health conditions and/or disabilities worsened necessitating weekly medical treatment.

25.    Mr. Wilkins required Plaintiff to schedule her appointments before or after work hours. But, Plaintiff was only able to schedule appointments during normal business hours.

26.    During this same time, Mr. Marsh began to send out companywide emails impressing upon employees the importance of being present at work. Despite weekly medical appointments, Plaintiff continued to work approximately 50 hours per week.

27. Beginning in May 2018, Plaintiff's weekly one-on-one meetings with Mr. Wilkins became one sided, with Mr. Wilkins doing most of the speaking. When Plaintiff spoke, Mr. Wilkins would not respond.

28. On or about June 29, 2018, Plaintiff had a one-on-one meeting with Mr. Wilkins. During that meeting, Mr. Wilkins requested numerous items previously discussed and provided by Plaintiff. Plaintiff had to resend him numerous items that she previously sent, including a contract for Rea & Associates to fix payroll issues that Plaintiff uncovered during her employment that occurred prior to her start date.

29. During Plaintiff and Mr. Wilkins' one-on-one meeting on July 2, 2018, Mr. Wilkins gave Plaintiff a new list of tasks to complete. Plaintiff asked for assistance prioritizing her tasks given her already heavy workload and a time-consuming personnel issue. Mr. Wilkins offered no assistance. Without guidance, Plaintiff continued working on her workload prior to the meeting and the personnel issue.

30. On or about July 6, 2018, Plaintiff began seeing a physician biweekly for medication management for treatment of her serious health conditions and/or disabilities. Mr. Wilkins again instructed Plaintiff to schedule her appointments before or after work. Plaintiff's physician did not offer after-hour appointments. Mr. Marsh again sent out a companywide email to tell employees the importance of being present at work. Despite medical appointments every other week, Plaintiff continued to work approximately 50 hours per week.

31. As a result of her accommodation requests for FMLA eligible leave, Plaintiff's working relationship with Mr. Wilkins and Mr. Marsh deteriorated.

32.    During Plaintiff's very brief one-on-one meeting with Mr. Wilkins on July 9, 2018, Mr.
       Wilkins cryptically said to Plaintiff, "Very little happens within an organization without
       executive support." Plaintiff did not know what that meant. Mr. Wilkins then ended the
       meeting citing a schedule change.

33.    After Plaintiff's one-on-one meeting, Mr. Wilkins held the Administrative Manager's
       meeting, where he addressed all of Plaintiff's peers, but ignored Plaintiff altogether.

34.    On or about August 22, 2018, Mr. Shuster had major surgery. Plaintiff was scheduled to
       be out of the office from August 22, 2018 through August 27, 2018. While off work for
       Mr. Shuster's surgery and recovery, Plaintiff worked, including leaving the hospital on
       August 23, 2018 to go to the Morse Road Transfer Station to deal with an employee
       issue.

35.    During early September 2018, David Logan, Accounting and Finance Manager, accosted
       Bernie Davis, Technology Solutions Manager, in his office and impeded Mr. Davis'
       ability to leave. Mr. Davis telephoned Plaintiff that evening to complain that Mr. Logan
       was a "ticking time bomb." Plaintiff reported the incident to Mr. Wilkins the next day.

36.    On October 22, 2018, Plaintiff requested intermittent FMLA to attend weekly medical
       appointments. Plaintiff requested the intermittent FMLA due to Mr. Wilkins instructions
       to schedule medical appointments outside normal working hours, and Mr. Marsh's timely
       companywide emails advising employees the importance of being present.

37.    Plaintiff submitted her Certification of Healthcare Provider to Tammy Streeter, HR
       Generalist, dated November 6, 2018. Plaintiff's FMLA was approved on November 16,
       2018. Despite requesting and using intermittent FMLA, Plaintiff continued to work at
       least forty hours per week.

38. After Plaintiff applied for intermittent FMLA on October 22, 2018, her relationship with Mr. Wilkins deteriorated significantly. Mr. Wilkins assigned Plaintiff's projects to other employees and dramatically decreased meetings and conversations with Plaintiff.

39. Plaintiff hired Findley, a consultant company, for a Compensation Study during April 2018. Plaintiff was the contact person for the Compensation Study. On November 7, 2018, Plaintiff learned that Mr. Wilkins inserted himself as the sole contact person for Findley.

40. On December 5, 2018, Plaintiff questioned Mr. Wilkins about regular rate of pay versus how Defendant currently paid staff for overtime. Mr. Wilkins purposefully would not respond.

41. During the Administrative Manager's meeting on December 10, 2018, Mr. Wilkins skipped over, talked over and blatantly ignored Plaintiff.

42. On December 12, 2018, Mr. Logan scheduled a conference call at 8:00 a.m., prior to Plaintiff's start time, with Rea & Associates regarding a tax issue for employees. Plaintiff texted Mr. Logan to inform him she might be a little late. Mr. Logan texted Plaintiff that if she was not there that she could reschedule the meeting because the tax issue was under her "purview anyway." Plaintiff informed Mr. Logan that she would be there, and Mr. Logan texted that he really did not need to be on the call. Plaintiff arrived on time for the call. When Plaintiff arrived, Mr. Logan left the call. The representative from Rea & Associates asked if Mr. Logan was on the call. When Plaintiff informed the representative from Rea & Associates that Mr. Logan had left, the representative indicated that Mr. Logan needed to be on the call. Plaintiff texted Mr. Logan that the representative wanted Mr. Logan on the call. Mr. Logan texted back, "I'm not sure why

I'm getting all this aggression from you lately, but it needs to stop. Invariably I'm here when you need assistance. This is something you clearly do not need my assistance on and is not an A&F matter."

43. On or about December 13, 2018 and based on Mr. Logan's behavior and employee complaints, Plaintiff gave Mr. Wilkins the EAP Mandatory Referral document for discussion with Mr. Logan and issue a letter indicating that Mr. Logan's participation was mandatory and a condition of continued employment. Mr. Wilkins refused to issue the letter to Mr. Logan.

44. On or about December 14, 2018, Plaintiff met with the Accounting and Finance ("A&F") and HR departments to discuss how to handle the payroll for the final pay of 2018. A&F suggested a retro payment to lessen the work. Plaintiff and Ms. Streeter notified ADP, created a plan, and advised the group. Plaintiff recommended a communication to employees advising them their pay may not hit their bank account until Friday, instead of Thursday, because of the holiday falling on a payroll processing day. A&F and HR, including Plaintiff, committed to working the weekend, including Christmas Eve, to process the payroll early. The Directors approved the plan and employee communication.

45. On or about December 17, 2018, Plaintiff informed Mr. Wilkins that she had a death in the family that required her to travel out of state. Mr. Wilkins was concerned about completing payroll timely and other outstanding issues.

46. Plaintiff advised Mr. Wilkins that she would be working while at her family funeral and assured Mr. Wilkins that she would not let anything fall through the cracks while she was away, including payroll.

47.   On December 21, 2018, Plaintiff entered 32 hours on her timecard for the time that she worked while at her family funeral.

48.   Mr. Wilkins sent an email almost immediately instructing Plaintiff to enter 24 hours of paid time off when she worked more than 32 hours during travels to her family funeral.

49.   In early January 2019, Plaintiff received a negative performance evaluation. Plaintiff disputed the performance evaluation in writing on January 14, 2019, which Mr. Wilkins totally ignored.

50.   On January 11, 2019, Plaintiff received another complaint regarding Mr. Logan creating a hostile work environment. Plaintiff asked to speak with Mr. Wilkins on January 14, 2019 about hiring an outside party to conduct an investigation, but Mr. Wilkins and Rebecca Egelhoff, Managing Counsel, refused. Instead, they required Plaintiff to get the employee complaints in writing but the employees refused out of fear of retaliation. As a result, Mr. Logan was never investigated or disciplined for his behaviors and creating a hostile work environment.

51.   During Plaintiff's team work session on January 15, 2019, Plaintiff asked Mr. Wilkins to meet with Plaintiff and her team to discuss the employee payroll issues for 2018 and schedule the payroll calendar for 2019. Mr. Wilkins ignored Plaintiff's request.

52.   Mr. Wilkins' failure to communicate with Plaintiff worsened during January 2019.

53.   On or about February 7, 2019, Plaintiff attended a meeting to discuss ongoing payroll tax issues. During the meeting, Plaintiff learned for the first time that the contract for the outside vendor was almost out of money. Despite being the lead on the project, the invoices and information had been withheld from Plaintiff.

54. During early February 2019, Mr. Logan requested intermittent FMLA for surgery. Mr. Wilkins permitted Mr. Logan to work from home during his intermittent FMLA and did not require him to use paid time off.

55. Later in February 2019, Bernie Davis was out of the office for a medical condition. Mr. Davis never completed FMLA paperwork. Mr. Wilkins allowed Mr. Davis to work from home without using paid time off.

56. Plaintiff learned that Mr. Wilkins had multiple conversations with one of Plaintiff's subordinates about a project that Plaintiff lead. During Plaintiff's one-on-one meeting with Mr. Wilkins on or about February 25, 2019, Plaintiff told Mr. Wilkins that he was impeding her ability to effectively manage her department. Plaintiff also informed Mr. Wilkins that a coworker told her that Mr. Wilkins was "trying to catch" Plaintiff at something to justify her termination. Mr. Wilkins ignored Plaintiff.

57. In early 2019, Mr. Wilkins told Plaintiff that she could no longer use her work calendar in Outlook for personal appointments and nothing could be private. Policy dictated that employee calendars be up to date to include personal appointments scheduled during normal working hours. Defendant's policy and practice allowed employees to list appointments as private. Therefore, Plaintiff listed all appointments on her calendar and marked her personal appointments private. As head of HR, Plaintiff marked her meetings with employees private as well.

58. Plaintiff confirmed with Mr. Logan and Mr. Davis, similarly situated non-disabled, male employees, that neither one of them had the same instructions from Mr. Wilkins.

59. On or about March 5, 2019, Plaintiff received a complaint about an employee threatening another employee, who was a friend of Scott Perry, Director of Operations and Facilities,

at the Jackson Pike Transfer Station. Against Plaintiff's instruction as head of HR, Defendant moved the complaining employee to the Morse Road Transfer Station. The transferred employee complained that he was being punished for reporting an incident involving an employee that was a friend of Mr. Perry.

60. On or about March 11, 2019, Mr. Wilkins dumped a significant amount of work on Plaintiff and her staff without any deadlines or clear directions. Plaintiff requested that Mr. Wilkins meet with her and her staff to discuss the work, but Mr. Wilkins refused.

61. On or about March 12, 2019, Mr. Wilkins assigned work to one of Plaintiff's subordinates without Plaintiff's knowledge.

62. On or about March 12, 2019, Plaintiff made Mr. Wilkins meet with her to clarify the expectations of an Onboarding Project due to the expectation and directions of Mr. Wilkins versus the other directors.

63. On or about March 15, 2019, Plaintiff's physician took her off work from March 15, 2019 through March 22, 2019, returning to work March 25, 2019. Plaintiff let Ms. Streeter and Mr. Wilkins know that she would be out of the office and would only be available for emergency situations. Plaintiff's physician revised Plaintiff's FMLA for up to 16 hours per week per flare-up.

64. Despite the revised intermittent FMLA, Plaintiff continued to work at least 40 hours per week.

65. While Plaintiff was on medical leave, Mr. Wilkins reassigned one of Plaintiff's projects without telling Plaintiff before or after the fact.  Plaintiff learned that she was no longer on the project from one of her subordinates.

66.    There was minimal communication between Plaintiff and Mr. Wilkins during the remainder of March 2019.

67.    Ms. Streeter received Plaintiff's revised FMLA paperwork from Plaintiff's treating physician and notified Mr. Wilkins of the changes and restrictions. Plaintiff put a copy of her physician's note for March 15-22, 2019 in Mr. Wilkins' mailbox when she returned to the office on March 25, 2019. Plaintiff also let Mr. Wilkins know that she would need to leave at 3:30 p.m. for a doctor's appointment and asked if she could work the time missed at home. Mr. Wilkins said no. He told Plaintiff that she would need to request time off.

68.    On or about April 4, 2019, Plaintiff sent an email to staff working on a tax issue stating that the time taken to obtain a resolution was unacceptable.

69.    When Plaintiff arrived at the office on or about April 5, 2019, Mr. Logan accosted Plaintiff about her April 4, 2019 email. Mr. Logan berated Plaintiff by cursing and screaming at her.

70.    Plaintiff filed a formal complaint via email to Mr. Wilkins on or about April 5, 2019. Plaintiff again requested that Defendant hire an outside party to conduct the investigation against Mr. Logan. Mr. Wilkins did not respond to or acknowledge Plaintiff's written email complaint.

71.    Plaintiff met with Mr. Marsh on or about April 9, 2019 to complain about Mr. Logan creating a hostile work environment. Plaintiff explained that she received several complaints regarding Mr. Logan, but Mr. Wilkins and Ms. Egelhoff required written statements, not hire an outside party to conduct an investigation as she suggested. Plaintiff explained that employees refused to put anything in writing out of fear of

retaliation. Mr. Marsh appeared to not know about Mr. Logan creating a hostile work environment, despite the previous complaints to Mr. Wilkins.

72.    Plaintiff attended a one-on-one meeting with Mr. Wilkins on or about April 11, 2019. Plaintiff informed Mr. Wilkins that she was upset and asked for permission to speak freely without retribution. Mr. Wilkins agreed. The following topics were discussed:

a.    Goals and priorities were overwhelming, and Plaintiff had not received any assistance from Mr. Wilkins regarding prioritizing.

b.    Plaintiff learned from Mr. Wilkins that she was removed from the Employee Survey project only when she emailed Mr. Wilkins asking him a question.

c.    Plaintiff asked why her expenses were being denied when others' expenses for staff luncheons were approved. Mr. Wilkins stated that Plaintiff's expenses would be approved this once but not in the future for staff luncheons.

d.    Plaintiff brought up that she had worked the hours as reported while at her family funeral in December 2018 and explained all the work that she completed.

e.    Plaintiff asked about her complaint against Mr. Logan. Mr. Wilkins stated that Plaintiff would never know what Defendant did with the complaint, even though Plaintiff was the head of HR.

f.    Plaintiff complained that she was being treated differently than other managers that report to him.

g.    Plaintiff told Mr. Wilkins that he was impeding her ability to manage her department and the perception by others was that he was trying to "catch" Plaintiff at something to secure her termination.

h. Plaintiff complained that Mr. Wilkins gave Plaintiff assignments without clear instructions and then tied one hand behind her back. On multiple occasions, Mr. Wilkins refused to meet with Plaintiff and her team to discuss assignments.

i. Plaintiff advised Mr. Wilkins that it was obvious that he did not respect or trust her and it caused discord among the employees.

j. Plaintiff stated that she spent more time and energy surviving day-to-day than she did at performing her job to her expectations.

k. Plaintiff shared with Mr. Wilkins that she was hired to do a job which meant they knew she was well qualified, a professional in her field, and more than capable of exceeding the position expectations. However, Plaintiff was not trusted to perform the duties of the position.

l. Plaintiff explained that the Email Guidelines created by the Back to the Basic Initiatives state that employees should timely respond to emails, but Mr. Wilkins rarely even responded to Plaintiff's emails, let alone timely responded.

m. Plaintiff complained that Mr. Wilkins did not listen to her when she spoke, and other employees agreed.

n. Plaintiff reminded Mr. Wilkins that she asked for assistance from him, particularly on the Onboarding Project, and he did not feel it was necessary to talk to Plaintiff or her team.

o. Plaintiff informed Mr. Wilkins that he undermines her authority when he gave her staff tasks without talking to her first and the staff has expectations that Plaintiff has asked them to complete the tasks.

p. Plaintiff asked Mr. Wilkins point blank whether he was trying to get rid of her or manage her out the door.

q. Plaintiff asked Mr. Wilkins if she was being retaliated against for using FMLA and the complaint that she filed against Mr. Logan. Mr. Wilkins just stared at Plaintiff.

r. Plaintiff advised Mr. Wilkins that she was very disappointed that he did not talk to her about her comments to her performance evaluation but, instead, placed the signed original in her mailbox when she was out of the office.

73. Mr. Wilkins had hardly any comments during the one-on-one meeting, so Plaintiff asked to be excused.

74. On or about April 29, 2019, Ms. Egelhoff asked Ms. Streeter for two FMLA files, a female employee in Accounting on intermittent FMLA and Plaintiff's. Ms. Egelhoff wanted the entire files on both individuals. HR received several reasons over the course of a few days as to why Ms. Egelhoff wanted the files.

75. Ms. Egelhoff initially advised Plaintiff that she was reviewing the HR process due to Ms. Streeter's inability to properly answer Mr. Logan's question on an employee FMLA file.

76. One of Plaintiff's subordinates stated that it was a smokescreen because upper management just wanted Plaintiff's FMLA file, which Mr. Marsh confirmed. Plaintiff had Ms. Streeter redact all medical information and provided the files to Ms. Egelhoff. Ms. Egelhoff asked for more information in the FMLA files.

77. Plaintiff reached out to her network contacts to see if she should provide the medical information to Ms. Egelhoff. All of them advised Plaintiff to stand her ground and not release the medical information.

78. On April 29, 2019, Plaintiff filed an online charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff had a telephone interview with the EEOC on May 6, 2019. Plaintiff digitally signed the charge of discrimination, Charge No. 532-2019-01617, on May 20, 2019. Plaintiff alleged sex discrimination, age discrimination, disability discrimination, and retaliation.

79. On or about May 1, 2019, Plaintiff expressed her concern about turning over the FMLA records with the medical information. Plaintiff asked why they did not ask for everyone that was on FMLA. Mr. Marsh said they only needed Plaintiff's because she was out of FMLA time, which was incorrect.

80. Plaintiff explained that HR is the gatekeeper of employee information. Plaintiff informed Mr. Marsh that the medical records are intentionally kept separate to prevent discrimination and to ensure an employee's privacy and confidentiality are maintained. Plaintiff shared with Mr. Marsh that the ADA guidelines state that medical records should only be shared under certain criteria, such as a request for a reasonable accommodation, restricted duties or if on-site medical treatment is required.

81. Plaintiff complained to Mr. Marsh that Ms. Egelhoff and Mr. Wilkins were walking a tight rope on FMLA interference. Plaintiff complained that an employer may not attempt to validate its actions to attempting to establish a legitimate business reason. Plaintiff told Mr. Marsh that, as Defendant's HR Manager, and in the best interest of Defendant, the request and persistence on behalf of legal or anyone to view these files is wrong and it must stop. Mr. Marsh said that he would get back with Plaintiff as soon as possible.

82. Later in the day on May 1, 2019, Mr. Marsh ordered Plaintiff to provide the FMLA documents without medical information to Ms. Egelhoff.

83.   Before Mr. Marsh left Plaintiff's office, Plaintiff stated that she had this overwhelming perception that she was not wanted at Defendant and asked if this was his sentiment. Mr. Marsh advised Plaintiff that she needed to be present more.

84.   On or about the morning of May 2, 2019, Plaintiff called a meeting with Ms. Streeter, Mr. Wilkins, and Ms. Egelhoff to discuss the purpose for the FMLA files with medical information included. Plaintiff told Mr. Wilkins that Mr. Marsh advised her that Ms. Egelhoff needed the files because Plaintiff was out of FMLA time, which was inaccurate. Ms. Egelhoff said she had a right to the confidential information. Plaintiff asked if she could redact the diagnoses. Ms. Egelhoff said yes but that Plaintiff was preventing her from doing her job and she wanted everything by the end of business on May 3, 2019. Plaintiff redacted the diagnosis and anything that would obviously lead to a diagnosis and provided the FMLA files to Ms. Egelhoff.

85.   On May 3, 2019, Ms. Streeter was notified by an employee that he did not receive his pay. Plaintiff and Ms. Streeter later learned that they had been scammed by a phishing email. Plaintiff and Ms. Streeter ensured the employee got paid and notified Mr. Wilkins immediately of the scam.

86.   After meeting with Plaintiff, Mr. Wilkins met with Ms. Streeter about the phishing scam.

87.   On May 14, 2019, Mr. Wilkins and Ms. Egelhoff notified Plaintiff that she was being terminated for not catching the phishing scam and that her performance was allegedly lacking.

88.   On or about September 3, 2019, Plaintiff submitted an amended charge of discrimination to add an ADA Association claim, to dismiss her age discrimination claim, and to include her termination.

89.    The EEOC issued a Right to Sue on request on November 4, 2020, attached hereto as Exhibit 1.

90.    Similarly situated male, non-disabled managers were treated more favorably than Plaintiff. Kyle O'Keefe, David Logan, Bernard Davis, and Terry Blazer each had performance issues, engaged in behavior considered a disciplinary and/or terminable offense by Defendant policy, were not subjected to professional sabotage, and enjoyed more favorable terms and conditions of employment, including but not limited to working from home, but were not disciplined or terminated.

## COUNT I: DISABILITY DISCRIMINATION, 42 U.S.C. § 12101, *et seq.*

91.    Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

92.    Plaintiff is disabled as that term is defined by the ADA, 42 U.S.C. § 12102(1)(A), because she has a mental impairment that substantially limits one or more major life activities. Plaintiff's disabilities substantially limit the following major life activities, including but not limited to: concentration, motivation, sleep, ability to complete tasks, memory, and work.

93.    Defendant knew that Plaintiff was disabled as defined by the ADA.

94.    Despite her disability, Plaintiff was able to perform the essential functions of her job with a reasonable accommodation, specifically time off work to attend medical appointments and/or a medical leave of absence. Accordingly, Plaintiff was an "otherwise qualified" individual.

95.    Defendant discriminated against Plaintiff because of her disability by taking the following non-exhaustive list of actions:  (1) terminating her employment; (2) replacing

19

her with someone who is not disabled, actual or perceived, and who does not have a record of a disability; and (3) otherwise treating her less favorably than similarly situated employees who are not disabled, actual or perceived, and who do not have a record of a disability.

96. As such, Defendant has violated 42 U.S.C. § 12101, *et seq.*, by discriminating against Plaintiff based on her disability.

97. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages as outlined herein.

98. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and attorneys' fees, costs, declaratory and injunctive relief, and all other relief available under the ADA.

## COUNT II: DISABILITY DISCRIMINATION, R.C. CHAPTER 4112

99. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

100. Plaintiff is disabled as that term is defined by the ADA, 42 U.S.C. § 12102(1)(A), because she has a disability that substantially limits one or more major life activities. Plaintiff's disabilities substantially limit the following major life activities, including but not limited to: concentration, motivation, sleep, ability to complete tasks, memory, and work.

101. Defendant knew that Plaintiff was disabled as defined by the ADA.

102. Despite her disability, Plaintiff was able to perform the essential functions of her job with a reasonable accommodation, specifically time off work to attend medical appointments

and/or a medical leave of absence. Accordingly, Plaintiff was an "otherwise qualified" individual.

103. Defendant discriminated against Plaintiff because of her disability by taking the following non-exhaustive list of actions: (1) terminating her employment; (2) replacing her with someone who is not disabled, actual or perceived, and who does not have a record of a disability; and (3) otherwise treating her less favorably than similarly situated employees who are not disabled, actual or perceived, and who do not have a record of a disability.

104. As such, Defendant has violated R.C. 4112.02(A) and 4112.99 by discriminating against Plaintiff based on her disability.

105. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages as outlined herein.

106. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and attorneys' fees, costs, declaratory and injunctive relief, and all other relief available under R.C. Chapter 4112.

## COUNT III: DISABILITY ASSOCIATION DISCRIMINATION, 42 U.S.C. § 12112(b)(4)

107. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

108. Plaintiff was qualified for her job as HR Manager.

109. Plaintiff suffered an adverse action when Defendant terminated her employment.

110. After Defendant terminated Plaintiff's employment, in part, because of her husband's health issues which necessitated Plaintiff utilizing FMLA leave.

111. Defendant violated 42 U.S.C. § 12112(b)(4).

112.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages as outlined herein.

113.    Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and attorneys' fees, costs, declaratory and injunctive relief, and all other relief available under the ADA.

## **COUNT IV: FMLA INTERFERENCE, 29 U.S.C. § 2601, *et seq.***

114.    Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

115.    Plaintiff has a serious health condition as that term is defined by the FMLA because she has mental conditions that involve continuing care by a health care provider pursuant to 29 U.S.C. § 2611(11)(B).

116.    Plaintiff was an eligible employee as defined under 29 U.S.C. § 2611(2)(A), and Defendant was an employer as defined under 29 U.S.C. § 2611(4)(A)(i).

117.    Plaintiff was entitled to FMLA leave pursuant to 29 U.S.C. § 2612(a)(1)(D) and (b)(1).

118.    Defendant interfered with Plaintiff's FMLA leave by requiring Plaintiff to schedule appointments outside of her working hours, even though her providers only had appointments during normal business hours, and terminating her employment to avoid further use of FMLA.

119.    Plaintiff states a cause of action against Defendant for interference with Plaintiff's exercise of FMLA rights in violation of 29 U.S.C. § 2615(a)(1).

120.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages as outlined herein.

121. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and attorneys' fees, costs, declaratory and injunctive relief, and all other relief available under the FMLA.

**COUNT V: FMLA RETALIATION, 29 U.S.C. § 2601, *et seq.***

122. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

123. Plaintiff engaged in protected activity when she exercised her FMLA rights and took FMLA qualifying leave.

124. Defendant knew of Plaintiff's intermittent and one-week medical leave during March 2019.

125. After Plaintiff's exercise of her FMLA rights, she suffered an adverse employment action when Defendant (1) terminated her employment; (2) replaced her with someone who did not have a serious health condition that required FMLA qualifying leave; and (3) otherwise treated her less favorably than similarly situated employees who did not have a serious health condition that required FMLA qualifying leave.

126. Plaintiff states a cause of action against Defendant for FMLA retaliation in violation of 29 U.S.C. § 2615(a)(2).

127. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages as outlined herein.

128. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and attorneys' fees, costs, declaratory and injunctive relief, and all other relief available under the FMLA.

**COUNT VI: SEX DISCRIMINATION, 42 U.S.C. 2000e, *et seq.***

129. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

130. Plaintiff is a member of a protected class because she is female.

131. Plaintiff was qualified for the position of HR Manager.

132. Defendant took adverse employment actions against Plaintiff, by taking the following non-exhaustive list of actions:  (1) terminating her employment; (2) replacing her with someone who is a male; and (3) otherwise treating her less favorably than similarly situated employees who are male.

133. Defendant discriminated against Plaintiff because of her sex in violation of 42 U.S.C. § 2000e-2(a)(1) and/or Plaintiff's sex was a motivating factor in Defendant's decision to terminate her in violation of 42 U.S.C. § 2000e-2(m).

134. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages as outlined herein.

135. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and attorneys' fees, costs, declaratory and injunctive relief, and all other relief available under Title VII.

## COUNT VII: SEX DISCRIMINATION, R.C. CHAPTER 4112

136. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

137. Plaintiff is a member of a protected class because she is female.

138. Plaintiff was qualified for the position of HR Manager.

139. Defendant took adverse employment actions against Plaintiff, by taking the following non-exhaustive list of actions:  (1) terminating her employment; (2) replacing her with

someone who is a male; and (3) otherwise treating her less favorably than similarly situated employees who are male.

140. Defendant discriminated against Plaintiff because of her sex in violation of R.C. 4112.02(A) and 4112.99.

141. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages as outlined herein.

142. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and attorneys' fees, costs, declaratory and injunctive relief, and all other relief available under the R.C. Chapter 4112.

## COUNT VIII: ADA RETALIATION, 42 U.S.C. § 12203

143. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

144. Plaintiff engaged in protected activity when (1) she requested medical leave for her disability, (2) took medical leave, and (3) complained that she was being targeted for termination for taking medical leave.

145. Defendant was aware that Plaintiff engaged in protected activity.

146. Defendant took the following non-exhaustive list of adverse employment actions against Plaintiff: (1) terminated her employment; (2) replaced her with someone who is not disabled, actual or perceived, and who does not have a record of a disability; and (3) otherwise treated her less favorably than similarly situated employees who are not disabled, actual or perceived, and who do not have a record of a disability.

25

147. There is a causal connection between Plaintiff's protected activity and the adverse employment actions.

148. Defendant retaliated against Plaintiff in violation of 42 U.S.C. § 12203.

149. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages as outlined herein.

150. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and attorneys' fees, costs, declaratory and injunctive relief, and all other relief available under the ADA.

## COUNT IX: DISABILITY RETALIATION, R.C. 4112.02(I)

151. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

152. Plaintiff engaged in protected activity when (1) she requested medical leave for her disability, (2) took medical leave, and (3) complained that she was being targeted for termination for taking medical leave.

153. Defendant was aware that Plaintiff engaged in protected activity.

154. Defendant took the following non-exhaustive list of adverse employment actions against Plaintiff: (1) terminated her employment; (2) replaced her with someone who is not disabled, actual or perceived, and who does not have a record of a disability; and (3) otherwise treated her less favorably than similarly situated employees who are not disabled, actual or perceived, and who do not have a record of a disability.

155. There is a causal connection between Plaintiff's protected activity and the adverse employment actions.

156. Defendant retaliated against Plaintiff in violation of R.C. 4112.02(I).

157. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages as outlined herein.

158. Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and attorneys' fees, costs, declaratory and injunctive relief, and all other relief available under the R.C. Chapter 4112.

**WHEREFORE,** Plaintiff Deborah Shuster prays for judgment in her favor, back pay, front pay or reinstatement, punitive damages, pain and suffering, compensatory and non-economic damages in an amount exceeding $75,000, attorneys' fees, costs, pre- and post-judgment interest, injunctive and declaratory relief, and any other relief to which she may be entitled.

Respectfully Submitted,

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
THE KNOLL LAW FIRM, LLC
7240 Muirfield Drive, Suite 120
Dublin, Ohio 43017
Telephone: (614) 372-8890
Facsimile: (614) 452-4850
Email: lknoll@knolllaw.com
*Trial Attorney for Plaintiff Deborah Shuster*

## JURY DEMAND

Plaintiff requests a trial by a jury an all issues set forth herein.

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
THE KNOLL LAW FIRM, LLC
*Trial Attorney for Plaintiff Deborah Shuster*